

FILED
2012 Jan-05  PM 02:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **DERRICK LUCY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-10-S-243-NE** |
| | ) | |
| **GEORGIA-PACIFIC** | ) | |
| **CORRUGATED I, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Derrick Lucy ("plaintiff" or "Lucy"), who is an African-American ("black"), commenced this action against his former employer, Georgia-Pacific Corrugated I, LLC ("defendant" or "Georgia-Pacific"), on February 1, 2010.[1]  His complaint contained claims for discrimination on the basis of race and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981.[2]  Defendant moved for summary judgment on both claims.[3]  In his response brief, plaintiff explicitly abandoned his retaliation

---

[1] *See* doc. no. 1 (Complaint).

[2] *Id.*  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a).  Unlike Title VII, it addresses discrimination only on the basis of race, and does not require a plaintiff to pursue administrative remedies prior to bringing suit.  A plaintiff claiming race discrimination can rely on Title VII, § 1981, or both.

[3] *See* doc. no. 21 (Motion for Summary Judgment).

claim, so the court is left only to decide the race discrimination claim.[4]  Upon consideration of the motion, briefs, and evidentiary submissions, the court concludes that summary judgement is due to be entered in favor of Georgia-Pacific.

## I.  LEGAL STANDARDS

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[5]  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact 'exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party.'" *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (quoting *Stewart v.*

---

[4] Doc. no. 23 (Brief in Opposition to Motion for Summary Judgment), at 2 ("Lucy no longer pursues his retaliation theory and pursues only his race discrimination theory.").

[5] Rule 56 was amended, effective December 1, 2010, in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "will not affect continuing development of the decisional law construing and applying these phrases." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

*Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284-85 (11th Cir. 1997)).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921); s*ee also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  FACTS

Georgia-Pacific manufactures corrugated cardboard boxes at its plant in Huntsville, Alabama.[6]  In March 2005, Derrick Lucy began working at the Huntsville

---

[6] Doc. no. 21-3 (Declaration of Randy Hunt) ¶ 2.

plant as a general floor worker.[7]   He was continuously employed at the plant until

February 2009.[8]   During the period of his employment, he worked on the "238"

machine as a "Second Helper" and a "First Helper."[9]   Lucy was laid off as part of a

reduction-in-force on February 23, 2009, and terminated from employment when he

failed to return to work five days after being called back in May 2009.[10]

## A.   Organization of the Plant

Georgia-Pacific divides its employees at the Huntsville plant into four main

departments:  (1) Corrugating; (2) Converting; (3) Shipping; and (4) Maintenance.[11]

The Corrugating, Converting, and Shipping departments together constitute a larger

"Production" department, which is distinct from the Maintenance department.[12]

Employees in the Production departments are expected to have manufacturing

experience.[13]

The employees in the Maintenance department are tasked with performing the

mechanical and electrical repairs necessary to keep the plant running smoothly.  At

---

[7] Doc. no. 21-7 (Deposition of Derrick Lucy), at 38, 42.

[8] *Id.* at 55.

[9] *Id.* at 42-43.

[10] *Id.* at 55, 87-90.

[11] Declaration of Randy Hunt ¶ 2.

[12] *Id.*

[13] Doc. no. 22 (Evidentiary Submission in Opposition to Summary Judgment), at Ex. A (Declaration of Derrick Lucy), at Attachment (Georgia-Pacific Advertisement) ("At least 1 year manufacturing experience required.").

one time, Maintenance personnel were responsible for performing regular "preventative maintenance" on the machines in the plant, but during the period of Lucy's employment, preventative maintenance was transferred to the Production employees assigned to each individual machine.[14]   Maintenance tasks require different skill-sets than the jobs in the Production departments, and can be dangerous.[15]   However, Georgia-Pacific has not articulated specific criteria necessary to qualify for a job in the Maintenance department.   Randy Hunt, the Plant Superintendent, testified only that "You have to have some kind of background in that department to do the job."[16]   Instead of producing a written job description with minimal requirements, Georgia-Pacific management personnel simply testified that "it is a matter of skilled labor vs. unskilled labor" that requires "demonstrated maintenance education and/or experience."[17]   Unsurprisingly, Lucy is unsure as to the required qualifications to work in Maintenance, and whether he meets them.[18]   In 2009, the Maintenance department at the Georgia-Pacific Huntsville plant was

---

[14] *See* Deposition of Derrick Lucy, at 48 ("Q:  Did maintenance perform any of these duties?  A:  No.  They used to, but they figured that we should do it."); Doc. no. 21-5 (Deposition of Randy Hunt), at 47-48, 62 ("It is not considered a maintenance position task.  I mean, all crew members do preventative maintenance.").

[15] Doc. no. 21-6 (Declaration of Melvin Yates) ¶ 16.

[16] Deposition of Randy Hunt, at 45.

[17] Declaration of Melvin Yates ¶¶ 3, 16.  *See also* Deposition of Randy Hunt, at 45.

[18] Declaration of Derrick Lucy, at 112-13 ("Q:  Do you contend that you are qualified without any training?  A:  I don't know the qualifications.  Q:  So you don't know whether you are qualified or not?  A:  I don't know.").

composed entirely of white workers.[19]   In contrast, the workforce of the plant as a

whole was roughly eighty-five percent black.[20]

## B.   The Collective Bargaining Agreement

The Huntsville plant is unionized, and dealings between Georgia-Pacific and

employees are governed by a collective bargaining agreement.[21]   Under that

agreement, any layoffs must proceed on the basis of seniority: *i.e.*, the shortest-

tenured employees are laid off first, and the longest-tenured employees are laid off

last.[22]   In other words, the last in are the first out.   The collective bargaining

agreement accounts for the possibility that junior employees may not hold the

positions the company is eliminating.   In such a case, senior employees whose

positions are to be eliminated have the option to "bump" more junior employees from

their positions, provided the bumping senior "employee can perform the [junior

employee's] job within an hour's instruction."[23]   If the bumped employee has

---

[19] *See, e.g.*, doc. no. 21-13 (Deposition of Leslie Ford), at 82.   There have been black maintenance workers in the past, including Louis Bethea, who worked at the plant in early 2007. Doc. no. 22 (Evidentiary Submission in Opposition to Summary Judgment), at Ex. D (Declaration of Louis Bethea) ¶¶ 2-3.

[20] Deposition of Leslie Ford, at 81.

[21] *See* Deposition of Derrick Lucy, at Ex. 2 (Collective Bargaining Agreement).   The union, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, was originally a defendant in this action, but was dismissed from the case on February 11, 2011.   Doc. no. 20.

[22] Collective Bargaining Agreement art. 13 §§ 3-4.

[23] *Id.* art. 13 § 6 (bracketed alteration supplied).

seniority over another employee with less seniority, he or she may bump that more junior employee, subject to the same condition. Thus, assuming each employee is capable of doing the job of those with less seniority, those employees with the least seniority will be laid off, regardless of the particular job positions the company is eliminating.[24]

The collective bargaining agreement also has a provision governing new job openings. Management is required to post notice of any "job vacancies at the bottom of a line of progression, as well as those jobs not in a line of progression" on a bulletin board in the plant.[25] Although the collective bargaining agreement does not make any distinction between Maintenance and Production positions for the purposes of job postings, both Tami Anderson, the Human Resources Manager, and Leslie Ford, the president of the local chapter of the union, testified that the posting requirement does not apply to Maintenance positions.[26] Moreover, the collective bargaining agreement offers the company more latitude in interviewing candidates for the Maintenance positions, allowing Georgia-Pacific to hire Maintenance employees from outside the union if no members of the union are "immediately

---

[24] *See id.* art. 13 § 4 (allowing an employee with seniority to remain employed "provided the employee can immediately perform the job available without the necessity of training and the employee possesses the requisite skill and ability and physical fitness to perform the job available").

[25] *Id.* art. 13 § 8.

[26] Doc. no. 21-11 (Deposition of Tami Anderson), at 79-84; Deposition of Leslie Ford, at 72.

qualified."[27]

## C.    The Reduction-in-Force

Prior to February 2009, Georgia-Pacific operated three daily shifts in its Huntsville plant.  Due to reduced orders, however, management determined that it was necessary to temporarily limit production to two shifts per day.[28]  Eliminating the third shift would reduce the workforce by about twenty-five employees.[29]  In order to implement the reduction-in-force, Georgia-Pacific instructed all employees at the Huntsville plant, regardless of which shift they worked, to report to the plant at seven o'clock on the morning of February 23, 2009.[30]

Management instructed Leslie Ford, an employee in the Converting department who serves as the president of the local chapter of the union, to arrive at six-thirty that morning.[31]  When he arrived that day, he was informed of the looming layoffs.[32]  At seven o'clock, Jim Henderson, the plant General Manager, told the employees that there would be a reduction-in-force.[33]  Henderson called the names of the most junior

---

[27] Collective Bargaining Agreement art. 13 § 8.

[28] Deposition of Tami Anderson, at 12.

[29] *Id.* at 18.  Some employees were on various forms of leave, so the actual number laid off was less than the twenty-five working the third shift.  *Id.* at 18-20.

[30] *See, e.g.*, Deposition of Derrick Lucy at 55-56; Deposition of Leslie Ford at 17.

[31] Deposition of Leslie Ford, at 14.

[32] *Id.*

[33] Deposition of Derrick Lucy, at 55-56; Deposition of Leslie Ford, at 20; Deposition of Tami Anderson, at 24.

employees, who were certain to be laid off.[34]  Those employees collected pamphlets on their rights to unemployment benefits and left the plant.[35]  Derrick Lucy was the most junior employee in any of the Production departments whose name was not called.[36]

The next step in the reduction-in-force was filling jobs opened by the layoffs. Under the layoff terms of the collective bargaining agreement, positions formerly held by junior employees on first and second shifts had come open, while more senior employees on the third shift were retained.  Randy Hunt, the Plant Superintendent, and Leslie Ford, the union president, began meeting with employees, one-by-one by department, beginning with the most senior employee in the department.[37]  Each employee called into the office chose from the following options:  remaining in his or her current job; taking an open position; or bumping an employee with less seniority.[38]  Those employees who were bumped were placed in the queue based on their seniority, and the process continued until every job had been filled.[39]  When

---

[34] Deposition of Derrick Lucy, at 56-57; Deposition of Leslie Ford, at 20.

[35] *See* Deposition of Tami Anderson, at 28; Deposition of Leslie Ford, at 22-23.

[36] Declaration of Randy Hunt ¶ 4; Declaration of Tami Anderson ¶ 5.

[37] Deposition of Randy Hunt, at 17-20; Deposition of Leslie Ford, at 29-30.  The Corrugating department was called in first, followed next by Shipping.  Deposition of Leslie Ford, at 29-30.

[38] Deposition of Randy Hunt, at 20-21.  Other than those who were bumped from their positions, every first and second shift employee chose remain in his or her position.  *Id.* at 21.

[39] *See id.* at 24-25 (explaining Donita Ratcliff's election of a new position after she had been bumped).

Lucy's turn to meet with management arrived, he was informed that no positions remained, and he was not given a chance to choose a position.[40]

Prior to the reduction-in-force, Lucy held the position of First Helper on the "238" machine during the first shift.[41]  As a result of the reduction-in-force, Barry Maclin bumped him from that spot.[42]  Three black employees with more seniority than Lucy — Donita Ratcliff, Cedric Readus, and Pervis Williams — moved into Second Helper positions in Converting, including that position on the "238" machine for the first shift.[43]  Immediately prior to the reduction-in-force, Readus and Williams worked in the Corrugating department,[44] and Ratcliff worked in the Shipping department.[45]  However, each had worked in the Converting department earlier in the course of his or her employment with Georgia-Pacific.[46]  At the time of the reduction-

---

[40] Deposition of Derrick Lucy, at 57-59; Deposition of Randy Hunt, at 43.

[41] Deposition of Derrick Lucy, at 42-44.

[42] *Id.* at 102; Declaration of Randy Hunt ¶ 6.

[43] *See* Declaration of Randy Hunt ¶ 12; Deposition of Derrick Lucy, at 202 (confirming that all three are black).

[44] Deposition of Leslie Ford, at 27; doc. no. 22, at Ex. B (Declaration of Cedric Readus) ¶ 2.

[45] Doc. no. 21-14 (Deposition of Donita Ratcliff), at 10.

[46] Deposition of Derrick Lucy, at 210 (testifying that Readus "worked in converting a few years earlier, then he went to the corrugator"); Declaration of Tami Anderson ¶ 13 (same); Deposition of Randy Hunt, at 34-35 (testifying that Williams "came to us and said [he had] been in the converting department before, we looked at his employment records, [and] determined that he was") (bracketed alterations supplied); Declaration of Tami Anderson ¶ 14 (same); Deposition of Donita Ratcliff, at 8-9 (testifying that she had worked on the "491" machine in Converting).

in-force, they were not required to demonstrate competence in their new positions,[47] and the record suggests that Ratcliff had difficulty performing her new job, Second Helper on the "238" machine.[48] Additionally, two white Maintenance employees with less seniority than Lucy, Alton Proctor and Benjamin Keller, kept their jobs.[49] Plant management did not consider the possibility that Lucy was qualified to bump into a Maintenance position. Randy Hunt testified that it "never crossed [his] mind" to move Lucy to Maintenance, because he just "assumed" that Lucy lacked the necessary credentials.[50]

Both black and white employees were among those immediately laid off on the morning of February 23.[51] When she met with Randy Hunt, Donita Ratcliff selected

---

[47] Declaration of Cedric Readus ¶ 2 ("[N]o one watched me work on the machine to determine if I was able to perform the job when I took it over.") (bracketed alteration supplied); Deposition of Donita Ratcliff, at 38-39 ("Q: [D]id anybody require you to demonstrate your ability to do the job as second helper? A: No. I could do it. Q: I'm not asking if you could do it, I'm asking did anybody say, ['S]how me[.']? A: No.") (bracketed alterations supplied).

[48] Jimmie Burton, the Operator on the "238" machine at that time, testified that Ratcliff was unable to keep up with the pace of work on the "238," slowing production considerably. Doc. no. 21-16 (Deposition of Jimmie Burton), at 21-28, 36. As a result, Burton faced disciplinary actions for the first time in eleven years as Operator on the "238." *Id.* at 31-33. Burton voluntarily took a demotion and pay cut to escape the problem. *Id.* at 8-11. Ratcliff was promoted to the position of Operator in his place. *Id.* at 9; Deposition of Donita Ratcliff at 13.

[49] *See* Declaration of Randy Hunt ¶ 10. One Maintenance employee, Lynn Long, a white woman, was laid off. Declaration of Tami Anderson ¶ 4.

[50] Deposition of Randy Hunt, at 44-45, 63 (bracketed alteration supplied). Hunt neither asked Lucy if he had maintenance experience nor checked his employment records to see what kind of experience he may have had. *Id.* at 46.

[51] *See* Deposition of Derrick Lucy, at 104 (testifying that Greg Thompson, a white employee, was laid off).

11

a position that had been held by one of those white employees prior to the reduction-in-force.[52]   However, no white employee was directly bumped by a black employee as a result of the meetings with Hunt during the reduction-in-force.  If Lucy had been allowed to bump Protor or Keller, that would have been the only instance of a black employee directly bumping a white employee.[53]   During the reduction in force, no Production employees moved into Maintenance positions.[54]

## D.   Lucy's EEOC Charge and Call Back to Work

Following the reduction-in-force, Lucy telephoned Leslie Ford, the union president, expressing frustration over the fact that he was laid off while two Maintenance employees with less seniority were allowed to keep their jobs.[55]   Ford told Lucy that he would investigate, and raised the issue with management.[56]   Ford received the explanation that the Maintenance positions were treated differently than Production positions for layoff purposes because of the experience required for

---

[52] *Id.*

[53] Plaintiff focuses much of his argument on this fact.  *See* Part III(C)(1)(c), *infra*.

[54] *See* Deposition of Tami Anderson, at 89-90 ("Q:  Since you worked at Georgia-Pacific, at that plant, has anybody else [other than Richmond Haney] moved from one department in the plant into maintenance?"  A:  No.") (bracketed alteration supplied).  Haney's move to Maintenance occurred before the reduction-in-force.  *See* part II(F), *infra*.

[55] Deposition of Leslie Ford, at 38-40, 44.

[56] *Id.* at 44-45.

Maintenance workers.[57]  Ford passed that explanation along to Lucy.[58]  Feeling he was qualified to work in Maintenance, Lucy filed a charge with the Equal Employment Opportunity Commission ("EEOC") on April 10, 2009, alleging that he was laid off on the basis of his race.[59]

While the EEOC charge was pending, Ford learned that Georgia-Pacific was planning to begin running a single machine on the third shift, and would be calling employees back to work to operate it.[60]  Ford called Lucy to inform him of this development.[61]  On April 23, 2009, Tami Anderson, the Human Resources Manager, sent Lucy a letter regarding the impending recall.[62]  Around the same time, Lucy spoke with Anderson on the phone.[63]  Anderson told Lucy that there would be a job opening on the second shift, and asked Lucy if he was interested in coming back to work.[64]  Lucy said he was interested in the position, and she told him to report to

---

[57] *Id.* at 45-46, 48.

[58] *Id.* at 50-52.

[59] Doc. no. 12 (EEOC Documents), at 3 (Charge of Discrimination).

[60] Deposition of Derrick Lucy, at 75.

[61] *Id.*

[62] Deposition of Tami Anderson, at Ex. 6 (Letter of April 23, 2009).

[63] Deposition of Derrick Lucy, at 71.  Anderson testified that she and Lucy had as many as six phone conversations, although Lucy only testified regarding two in particular.  *See* Deposition of Tami Anderson, at 44.  During the phone conversations, Lucy asked Anderson whether they should be speaking at all, because he had filed an EEOC charge and was represented by an attorney. *Id.* at 42, 46.  She informed him that he was being recalled to work regardless of any outstanding EEOC charge.  *Id.* at 42.

[64] Deposition of Derrick Lucy, at 72; Deposition of Tami Anderson at 67-68.

work on the next Friday.[65]  Anderson called Lucy the following day, telling him that

she had initially been mistaken, and that the position would actually be on the third

shift.[66]  Lucy indicated that he would probably not be able to work the third shift, due

to family obligations.[67]  Anderson reiterated the consequences of failing to report to

work, and indicated that he would be sent a letter outlining those terms.[68]  On May

6, she mailed him the letter, but he never reported to work, and was terminated via a

third letter, dated May 20, 2009.[69]

Eight days after informing Lucy that his employment was terminated, Georgia-

Pacific faxed the EEOC investigator a statement of its position on Lucy's

discrimination charge.[70]  The position statement said:

> Article 13, Section 3 of the labor agreement controls the manner in
> which the Company is required to conduct a lay off.  It requires that
> "employees with the greatest plant seniority *within each department or
> line of progression* shall be retained provided the employees are
> qualified to perform the work."  As Mr. Lucy correctly states in his
> charge, the Maintenance department is different from the Converting
> department, and as required by the contract layoffs in those departments
> are conducted on the basis of seniority *within each department.*  As one

---

[65] Deposition of Derrick Lucy, at 73; Deposition of Tami Anderson, at 67.

[66] Deposition of Derrick Lucy, at 74; Deposition of Tami Anderson, at 58.

[67] Deposition of Derrick Lucy, at 77; Deposition of Tami Anderson, at 60.

[68] Deposition of Tami Anderson, at 61.

[69] *Id.* at Ex. 7 (Letter of May 6, 2009) (recalling Lucy ); *id.* at Ex. 10 (Letter of May 20, 2009)
(terminating Lucy).  Lucy never definitively told Anderson that he would not be taking the position.
Deposition of Derrick Lucy, at 81.

[70] Deposition of Tami Anderson, at Ex. 12 (Georgia-Pacific Position Statement).

of the least senior employees in the Converting department, Mr. Lucy was laid off.  Race was simply not a factor.[71]

The EEOC investigation was inconclusive, and the EEOC informed Lucy of his right to sue on November 3, 2009.[72]

### E.   Lucy's Maintenance Credentials

Although plant management "assumed" Lucy lacked the experience and skills necessary to work in the Maintenance department, he does have a background in maintenance-related work.  Before his employment at Georgia-Pacific, Lucy held multiple jobs requiring mechanical skill.  Initially, he worked as an assembler for a company that produced automotive wire harnesses, which required him to read a schematic diagram and connect wires to components for use in automobiles.[73]  After leaving that job voluntarily, he took a position at another company, building street sweepers.[74]  In that job, he worked at multiple stations on an assembly line.[75]  He assembled wire harnesses, installed hydraulics, wired engines, and repaired vehicles.[76] He was certified to operate a forklift, and also operated an overhead crane.[77]  When

---

[71] *Id.* at 2 (quoting Collective Bargaining Agreement) (emphasis in Position Statement).

[72] Doc. no. 12, at 4 (Dismissal and Notice of Rights).

[73] Deposition of Derrick Lucy, at 19.

[74] *Id.* at 20.

[75] *Id.* at 22.

[76] *Id.* at 21-22, 37.

[77] *Id.* at 35.

an injury rendered him unable to continue at that company, Lucy took a new job as a plumber.[78]  In his plumbing job, Lucy's duties included "drain cleaning, repair plumbing, [and] replacing sinks [and] faucets."[79]  Lucy also enrolled at J.F. Drake State Technical College for a semester in 2004, taking courses on subjects relevant to maintenance work.[80]  Finally, while working at Georgia-Pacific, Lucy performed preventative maintenance on his "238" machine, including dissembling and rebuilding ink pumps, changing the blades on the machine, and replacing broken belts.[81]

Lucy listed each of his previous jobs on his application for employment with Georgia-Pacific.[82]  However, presumably due to limited space, the application did not reflect the full scope of his experience.[83]  For example, in his deposition, Lucy testified that his job building street sweepers involved "numerous power tools, bag tools, cutting torches, operating a forklift, overhead crane[,] hydraulics, assembly hydraulics, [and] reading schematics."[84]  The application, however, lists only "impact

---

[78] *Id.* at 22-23.

[79] Deposition of Derrick Lucy, at 24 (bracketed alterations supplied).

[80] *Id.* at 17, 33-34.  Lucy did not list his coursework at Drake State on his Georgia-Pacific job application.  *Id.* at 33-34.

[81] *Id.* at 46-48.

[82] *Id.* at Ex. 1 (Application for Employment), at 1.

[83] *Id.* at 35.

[84] *Id.* (bracketed alterations supplied).

tools, cutting torch, forklift, overhead crane."[85]   In contrast, Benjamin Keller and Alton Procter, the two white Maintenance employees with less seniority who kept their jobs after the reduction-in-force, provided comprehensive records of their maintenance credentials at the time they were hired.[86]

## F.   White Employee Allowed to Move into Maintenance

Although Georgia-Pacific argues that the Maintenance department is distinct from the three Production departments, which are essentially equivalent, at least one employee has moved from a Production department into Maintenance.  Richie Haney, a white Georgia-Pacific employee, was an Operator on the "275" machine in the converting department until early 2008, when demand for the boxes made by that machine slowed.[87]   Management decided to stop operating the "275" on the third shift.[88]   Melvin Yates, then the Plant Manager, asked Haney to assist with some Maintenance tasks.[89]   Although there were no open positions in Maintenance at the

---

[85] Deposition of Derrick Lucy, at Ex. 1, at 1.  The application also describes his duties as "assemble trucks using schematics," making no mention of the repair work.  *Id.*

[86] *See* Declaration of Tami Anderson, at Ex. 1 (Resume of Benjamin Keller); *id.* at Ex. 2 (Resume of Alton Proctor).  Keller had graduated from Drake State, as well as from a technical high school, and had nearly a decade of experience as an electrician.  *Id.* at Ex. 1.  Proctor had attained Electrical Apprentice Level III from Calhoun Community College, and had worked for over a decade as a maintenance mechanic at another company.  *Id.* at Ex. 2.

[87] Declaration of Tami Anderson ¶ 10.

[88] *Id.*

[89] *Id.*; doc. no. 21-6 (Declaration of Melvin Yates) ¶ 11.  The other employees assigned to the "275" were "moved . . . into open positions."  Declaration of Tami Anderson ¶ 10.

time, the department was "shorthanded."[90]

Yates thought Haney could be of help in the Maintenance department based on Haney's mechanical aptitude, which Yates had noticed while Haney was assigned to the "275" machine.[91]   Haney spent eight months working with the Maintenance department while still formally assigned to Converting.[92]   During that eight-month period, Haney: tore down machines; changed bearings, rolls, and fluids; made repairs to hydraulic and pneumatic systems; and replaced solenoids and cylinders.[93]   In addition to the time he spent assisting the Maintenance department, Haney had prior experience in maintenance-related tasks.   Before joining Georgia-Pacific, Haney worked on a farm, where his responsibilities included "servicing of farm equipment such as plows, tractors, [and] cotton pickers."[94]   He testified that he rebuilt tractor

---

[90] Declaration of Melvin Yates ¶ 11.  Plaintiff argues that this statement "defies logic." Doc. no. 23, at 10.  The court does find the statement puzzling, but it is conceivable that the company has a maximum number of Maintenance employees that cannot be increased regardless of the amount of maintenance work needed, creating the possibility of a fully staffed yet "shorthanded" department. Regardless, the "shorthanded" nature of Maintenance when Haney was allowed to begin helping that department is immaterial to the case.

[91] Declaration of Melvin Yates ¶ 8.  Specifically, Yates had observed Haney making a complex repair on his machine.  *Id.* ¶ 9 ("I observed Haney successfully dismantle the entire side of the machine on which he was the Operator, undertake the necessary servicing, and reassemble the machine.  I had never seen another Production employee do that or undertake anything requiring that level of maintenance aptitude.").

[92] *See* Doc. no. 21-15 (Deposition of Richmond Haney), at 13, 29.

[93] Deposition of Richmond Haney, at 38-40.  The *Oxford English Dictionary* defines a solenoid as "[a]n electro-dynamical spiral, formed of a wire with the ends returned parallel to the axis; a series of elementary circuits arranged on this principle."

[94] Deposition of Richmond Haney, at Ex. 1 (Application for Employment) (bracketed alteration supplied).  Haney's application also indicated that he operated front end loaders, tractors,

18

motors, made hydraulic repairs, and did "whatever needed to be done" to keep up "the everyday maintenance" of the trucks and tractors on the farm.[95]

Eventually, one of the mechanics in the Maintenance department left Georgia-Pacific, making a position available.[96]   The position was advertised externally, but was not posted on the plant's bulletin board.[97]   Haney submitted a resume and interviewed for the job, as did at least three outside candidates.[98]   Melvin Yates conducted the interviews.[99]   Haney was selected to fill the open Maintenance position.[100]

## G.    Racism in the Maintenance Department

Although the Maintenance department was exclusively staffed by white employees while Lucy worked at Georgia-Pacific, there have been black Maintenance employees in the past.  Louis Bethea worked in the Maintenance department in early

---

and turning plows on the farm, and a forklift at another job.  *Id.*

[95] *Id.* at 16.

[96] *Id.*

[97] *See* Deposition of Tami Anderson, at 85; Declaration of Tami Anderson ¶ 11; Deposition of Randy Hunt, at 96-97.

[98] Deposition of Tami Anderson, at 87; Deposition of Richmond Haney, at 36.

[99] Deposition of Richmond Haney, at 24; Deposition of Randy Hunt, at 95-96.

[100] Deposition of Tami Anderson, at 86-89; Deposition of Richmond Haney, at 36; Deposition of Randy Hunt, at 95-96.

2007.[101]  He was one of two black Maintenance employees at the time.[102]  The other

black Maintenance employee's duties were limited to putting oil in machines and

cleaning, and he was moved out of the Maintenance department during Bethea's

tenure with Georgia-Pacific.[103]  Bethea was terminated after just three months on the

job; he was told that he "did not have the skills necessary to do the job."[104]

      Bethea testified that he believed the actual reason for his termination was his

race.[105]  However, he did not file an EEOC charge or attempt to sue, because he "was

actually glad to get out of there."[106]  He stated that Georgia-Pacific was the most

racist environment in which he has ever worked.[107]  White Maintenance employees

frequently made racist jokes and comments in his presence.[108]  Conversely, Lucy

testified that he was never the victim of race-based comments while working at

Georgia-Pacific, and he does not allege that anyone in the Maintenance department

played any role in selecting him for termination.[109]

---

    [101] Declaration of Louis Bethea ¶ 2.  Defendant moved to strike this declaration.  Because the testimony contained therein is not dispositive, the motion to strike is due to be denied.

    [102] *Id.* ¶ 3.

    [103] *Id.*

    [104] *Id.*

    [105] *Id.*

    [106] *Id.*

    [107] Declaration of Louis Bethea ¶ 3.

    [108] *Id.*

    [109] Deposition of Derrick Lucy, at 65-66.  As detailed above, it was Hunt, not anyone in the Maintenance department, who conducted the process by which employees chose new positions

## III.  DISCUSSION

Plaintiff alleges race discrimination under both Title VII and § 1981.  The standards of proof and analytical framework are the same under both statutes.  *See, e.g.*, *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Where, as here, the plaintiff seeks to prove discrimination with circumstantial evidence, the court must analyze the case using the burden-shifting analytical framework first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).[110]   Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of intentional discrimination.   Establishment of the *prima facie* case creates a rebuttable presumption that the employer unlawfully discriminated against the employee.

If a plaintiff establishes a *prima facie* case of discrimination, the defendant employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action.  If the employer is silent in the face of the presumption created by the demonstration of a *prima facie* case, the court must enter judgment for the plaintiff, because no issue of fact remains in the case.

during the layoff.

[110] *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141-42 (2000).

If the defendant articulates one or more legitimate, non-discriminatory reasons for its decision, however, the presumption of discrimination created by the demonstration of a *prima facie* case is eliminated, and the plaintiff then has both the obligation and opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision, but simply a pretext for an unlawful, discriminatory animus.  If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding the credibility of each of the defendant employer's articulated reasons, the employer is entitled to summary judgment on the plaintiff's claim.  *See*, *e.g.*, *Burdine*, 450 U.S. at 254; *Chapman*, 229 F.3d at 1024-25; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

A.   *Prima Facie* **Case**

When a discharge occurs as part of a reduction-in-force, a plaintiff may establish a *prima facie* case by showing (1) that he is a member of a protected class, (2) that he was terminated, (3) that he was qualified for his current (or another) position at the time of discharge, and (4) that there is sufficient evidence from which a reasonable fact finder reasonably could conclude that the employer intended to discriminate on the basis of the plaintiff's protected trait when failing to retain him,

22

or consider him for continued employment in another position.  *See, e.g.*, *Standard*, 161 F.3d at 1331 (national origin and race-based reduction-in-force discrimination claims); *Coutu v. Martin County Board of County Commissioners*, 47 F.3d 1068, 1073 (11th Cir. 1995) (national origin reduction-in-force claim); *Wilson v. AAA Plumbing Pottery Corp.*, 34 F.3d 1024, 1027-28 (11th Cir. 1994) (race-based reduction-in-force claim).

Satisfactory evidence of an employer's intention to discriminate on the basis of race would include proof that plaintiff was selected for discharge during the reduction-in-force, while others not in the plaintiff's protected class, having comparable or lesser qualifications, were retained.  *Cf. Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984) (race-based termination claim).  The plaintiff's burden to initially satisfy the elements of a *prima facie* case is not great.  *See, e.g.*, *Burdine*, 450 U.S. at 253 ("The burden of establishing a prima facie case . . . is not onerous."); *Turlington v. Atlanta Gas Light Co.*, 153 F.3d 1428, 1432 (11th Cir. 1998) ("[A] plaintiff's burden in proving a prima facie case is light.") (bracketed alteration supplied).  Here, the first two elements are unquestionably satisfied — there is no dispute that plaintiff, who is black, is a member of a protected class, or that he was terminated.  However, defendant argues that plaintiff has failed to establish the final two elements of his *prima facie* case.

### 1.    Plaintiff's Qualifications for a Maintenance Position

"An individual is 'qualified' for a position, for purposes of employment discrimination law, if he meets the criteria that the employer has specified for the position." *Wright v. Southland Corp.*, 187 F.3d 1287, 1300 n.16 (11th Cir. 1999) (citing *Thornley v. Penton Publishing, Inc.*, 104 F.3d 26, 29 (2d Cir. 1997) ("As we understand this element, being 'qualified' refers to the criteria the employer has specified for the position.")).  Only objective criteria may be considered at the *prima facie* stage.  *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 769 (11th Cir. 2005) ("[T]o demonstrate that he was qualified for the position, a Title VII plaintiff need only show that he or she satisfied an employer's objective qualifications. . . . Specifically, we have made clear that the *prima facie* case is designed to include only evidence that is objectively verifiable and either easily obtainable or within the plaintiff's possession.") (bracketed alteration supplied).  At the *prima facie* stage, the plaintiff need not demonstrate that he was *more* qualified than the employee holding the position he desires.  *Walker v. Mortham*, 158 F.3d 1177, 1193 (11th Cir. 1998), *reh'g en banc denied*, 167 F.3d 542 (11th Cir. 1998), *cert. denied*, 528 U.S. 809 (1999) ("[T]he plaintiff need not introduce evidence regarding relative qualifications before [the pretext stage], she need only prove that she herself was qualified to perform the coveted job.") (bracketed alterations

supplied).

Making such an objective determination is difficult where there is no written job description to which the court can compare the plaintiff's qualifications. Plaintiff argues that the lack of a clear job description absolves him of the need to show that he was qualified.[111]  Plaintiff also alternatively asserts that he satisfies whatever qualifications defendant does require.[112]  Defendant argues that plaintiff's lack of credentials relative to the employees he sought to bump demonstrates that he was not qualified for the positions they held, but relies exclusively on caselaw discussing the use of relative qualifications at the pretext stage.[113]  As stated above, consideration of relative qualifications is improper in evaluating the plaintiff's *prima facie* case. Thus, in determining whether plaintiff is qualified, the court will focus on the qualifications plaintiff does have, in relation to those defendant has articulated as being required.

The qualifications for a position in Maintenance are not only unwritten, but apparently cannot be described with any precision.  Defendant seizes upon Lucy's inability to state the qualifications for the job to argue that he cannot show that he is

---

[111] *See* doc. no. 23, at 24 ("If the decision-maker does not even know what the required qualifications are, how can the employee be expected to show he was qualified for the job?  The absence of clear, objective qualifications dooms GP on this point.").

[112] *Id.* at 25.

[113] Doc. no. 21-1, at 22; doc. no. 24, at 3-5.

qualified for it.[114]  Yet defendant has not offered a clear definition, either.  Georgia-Pacific management described the work done by Maintenance employees as "skilled labor" requiring "some kind of background" in maintenance, that is, "significant experience and/or expertise."[115]  Defendant has offered no definition of the objective quantum of skill, background, experience, or expertise necessary to qualify for a position in Maintenance.[116]  Based on the managers' vague statements defining the required credentials, and the light burden in establishing a *prima facie* case, the court cannot conclude that Lucy was not qualified to work in Maintenance, as his experience servicing street sweepers and working as a plumber fits within the scope of "some kind of background" in maintenance work.

## 2.    Defendant's Intent to Discriminate on the Basis of Race

The final element of a *prima facie* case of discrimination in a reduction-in-force context requires the plaintiff to "present evidence from which a fact finder might reasonably conclude either that the defendant consciously refused to consider retaining or relocating a plaintiff because of his [race] or that defendant regarded

---

[114] Doc. no. 21-1, at 22.

[115] Declaration of Melvin Yates ¶¶ 3, 16; Deposition of Randy Hunt, at 45.

[116] In its briefs, defendant argues that plaintiff's credentials pale in comparison to the maintenance employees whom he would have bumped.  Doc. no. 21-1, at 22; doc. no. 23, at 4. Although the credentials of other Maintenance employees arguably provide evidence as to the requirements of the job, to treat them as such would amount to a relative qualifications analysis, improper at the *prima facie* stage.

[race] as a negative factor in such consideration." *Alexander v. Vesta Insurance Group, Inc.*, 147 F. Supp. 2d 1223, 1238-29 (N.D. Ala. 2001) (quoting *Coker v. Amoco Oil Co.*, 709 F.2d 1433, 1438 (11th Cir. 1983), *superseded by statute in part on other grounds as stated in Wilson v. General Motors Corp.*, 888 F.2d 779 (11th Cir. 1989)) (bracketed alterations supplied).  The mere fact that the employer chose to fill an available position with a person outside the protected group *is* sufficient to satisfy this element of the *prima facie* case.  *See Jameson v. Arrow Co.*, 75 F.3d 1528, 1533 (11th Cir. 1996) (in an age discrimination case, "[a]n employer's decision to transfer or to hire a younger employee for that available position is sufficient evidence to support an inference of discrimination for the limited purpose of establishing the plaintiff's *prima facie* case") (bracketed alteration supplied).

In *Jameson*, the Eleventh Circuit said that a member of a protected class must be given consideration when she "*applies* for a job for which she is qualified and which is *available* at the time of her termination." *Id.* at 1533 (emphasis supplied). The Eleventh Circuit later characterized *Jameson* as establishing a "requirement" that the plaintiff apply for an available position.  *Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1345 (11th Cir. 2003) (elements of *prima facie* case not satisfied where the plaintiff was aware of and did not apply for other openings at the company).  *See also Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436 (11th Cir. 1996)

(*prima facie* case satisfied where the plaintiff applied and interviewed for another position during a layoff); *Davis v. Valley Hospitality Services, LLC*, 372 F. Supp. 2d 641, 662 (M.D. Ga. 2005) *rev'd on other grounds*, 211 F. App'x 841, (11th Cir. 2006) (the plaintiff may establish *prima facie* case by "show[ing] that though she was qualified for and applied for an available position, the employer offered the job to someone outside the protected class") (bracketed alterations supplied).

Here, there is no dispute that two white employees with less seniority than Lucy kept their jobs in the Maintenance department. Defendant argues that plaintiff failed to apply for a Maintenance position, and thus he cannot establish a *prima facie* case.[117] However, the facts of this case differ significantly from those in which courts have held that plaintiffs are required to apply for open positions. In those cases, the plaintiff had some notice of the availability of the other position before being terminated. *See, e.g.*, *Smith*, 352 F.3d at 1344 ("Smith admitted that, after her termination meeting, but prior to her last day of work, she possessed knowledge of several positions listed as vacant on JSL's corporate website."); *Jameson*, 75 F.3d at 1532 (noting that the plaintiff specifically expressed interest in a position *later* filled by someone outside her protected class); *Isenbergh*, 97 F.3d at 436 (the plaintiff was one of ten candidates to interview for a new position created in a merger). Here, the

---

[117] Doc. no. 24, at 6.

layoffs were conducted over the course of a few hours on one morning, with each employee becoming aware of the options available to him only upon being called into Randy Hunt's office.[118]    Moreover, the bumping provision of the collective bargaining agreement allowed employees to choose positions that were not truly *open*, but instead filled by less senior employees, whom they were allowed to bump.

Thus, a simple recitation of the requirement that a plaintiff apply for an available position is inadequate in the factual situation presented here, as the only way Lucy could have "applied" for the Maintenance positions, or even known they were "available," would be through meeting with Hunt during the layoffs on February 23, 2009 — an opportunity he never had.  *See Vessels*, 408 F.3d at 768 ("[W]here an employer does not formally announce a position, but rather uses informal and subjective procedures to identify a candidate, a plaintiff need not show . . . that he applied for the position — only that the employer had some reason to consider him for the post.") (citing *Jones v. Firestone Tire & Rubber Co*., 977 F.2d 527, 533 (11th Cir. 1992)) (bracketed alteration supplied); *Davis*, 372 F. Supp. 2d at 662 (excusing the plaintiff from application requirement because "[i]t would strain reason to require Davis to apply for a position she did not know existed") (bracketed alteration supplied).  Lucy was not considered for the Maintenance positions held by white

---

[118] *See* Deposition of Randy Hunt, at 20-21.

employees despite the fact that he had more seniority than them and, thus, he has satisfied the final element of the *prima facie* case.

## B.   Articulation of a Legitimate, Non-Discriminatory Reason

Once the plaintiff has met his burden to establish a *prima facie* case, a presumption of discrimination arises.  The defendant must rebut that presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action.  The employer's burden at the second stage of analysis "is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)).  If the defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *Burdine,* 450 U.S. at 257, the presumption of discrimination created by the *prima facie* case "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10.  If the defendant fails to articulate a legitimate reason, the presumption created by the *prima facie* case is not rebutted, and the plaintiff is entitled to judgment as a matter of law.  *Id.* at 254; *Chapman*, 229 F.3d 1012, at 1024. In evaluating the defendant's articulation of a legitimate reason, the court does "not sit as a super-personnel department that reexamines an entity's business decisions."

*Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030.

Here, defendant states that "[t]he reason Plaintiff was not allowed to bump Keller or Proctor to retain employment during the layoff was a lack of awareness of any education or experience he had that would have enabled him to perform their jobs within an hour's instruction."[119]  Plaintiff disputes this articulation of the reason behind his termination, arguing that it conflicts with Hunt's testimony that he assumed Lucy did not have maintenance experience.[120]  Instead, plaintiff would recast defendant's explanation as "I didn't consider him because I assumed he did not have the experience but when it came his turn to come to the office to bid on a job I sent him away."[121]   Even plaintiff's restatement, however, does not amount to discrimination on the basis of his race.  As with defendant's actual statement of the

---

[119] Doc. no. 21-1, at 23 (bracketed alteration supplied).  Defendant also offered an alternate reason, that even had it been aware of plaintiff's qualifications, it would not have allowed him to bump into Maintenance.  Doc. no. 21-1, at 23-24.  However, plaintiff rightfully argues that an employer's articulation of a legitimate reason cannot be a reason on which it did not actually rely. Doc. no. 23, at 32 (citing *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061-62 (11th Cir. 1994)). Thus, the court will not consider defendant's alternate explanation.

[120] Doc. no. 23, at 30.

[121] *Id.* at 31.

reason Lucy was laid off, plaintiff's explanation focuses on Hunt's lack of knowledge of Lucy's experience.  Plaintiff has failed to "meet that reason head on and rebut it." *Chapman*, 229 F.3d at 1030.

Plaintiff cites *Byrd v. Lakeshore Hospital*, 30 F.3d 1380 (11th Cir. 1994), for the proposition that the defendant bears the burden to prove an "unusual scenario."[122] In *Byrd*, the plaintiff was terminated in part for taking her allotted pregnancy leave. *Id.* at 1381.  The defendant argued that the plaintiff had to prove that she was treated differently from non-pregnant employees:  *i.e.*, that they were not terminated for taking their sick leave.  *Id.* at 1383.  The court held that because firing employees for taking their sick leave (and thus failing to follow the company's own policy) would be an "unusual scenario," the defendant had the burden to prove that was actually its practice.  *Id.*  Plaintiff argues that by turning Lucy away from his office, Hunt was "choosing to remain ignorant" of Lucy's qualifications, and that such voluntary ignorance is the type of "unusual scenario" discussed in *Byrd*.

Plaintiff's argument based on *Byrd* is unavailing.   Beyond stating that "[c]hoosing to remain ignorant is an unusual scenario,"[123] plaintiff has provided no

---

[122] In *Byrd*, the Eleventh Circuit was reviewing a district court decision that did not employ the *McDonnell Douglas* framework.  *Byrd*, 30 F.3d at 1383.  Because plaintiff relies on *Byrd* in arguing that defendant has failed to meet its burden in showing a legitimate reason for the adverse employment action, the court will address that argument in this Part of the opinion.

[123] Doc. no. 23, at 31 (internal quotation marks omitted).

support for his assertion that defendant's reason "is not a legitimate reason that would be relied on by a reasonable employer."[124]   The evidence in the record shows that Lucy had some experience relevant to maintenance work, but it also shows that Hunt was unaware of that experience and of Lucy's apparent desire to bump into the Maintenance department.[125]   Based on those facts, the court does not find that Hunt acted unreasonably (or even unusually) in acting on his assumptions.[126]   Indeed, it is quite reasonable to assume that an employee working in a manufacturing capacity would lack the necessary credentials to work in a more skilled repair capacity. Defendant has met its burden of articulating a legitimate, non-discriminatory reason for terminating plaintiff.

## C.    Pretext

When the defendant has successfully articulated a legitimate reason for the adverse employment action, the plaintiff must demonstrate that the articulated reason was pretextual.   Pretext can be shown by direct evidence "or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson v. State of Alabama State Tenure Commission*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting

---

[124] *Id.* (internal quotation marks omitted).

[125] Deposition of Randy Hunt, at 44-46.

[126] Of course, this is not to say that it would not have been more prudent for Hunt to call Lucy into his office to be certain.   However, it is not the role of the court to rule on the wisdom of an employer's decisions.   *See Chapman*, 229 F.3d at 1030 (collecting cases).

*Burdine*, 450 U.S. at 256).  At the pretext stage "[t]he district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Silvera v. Orange County School Board*, 244 F.3d 1253, 1258 (11th Cir. 2001) (quoting *Combs*, 106 F.3d at 1538) (bracketed alteration supplied).  The plaintiff can make this showing using the same evidence used to establish his *prima facie* case. *See Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804).  The plaintiff's evidence need not show that the proffered explanation is pretext *for discrimination* — he need only show that it is false:  *i.e.*, not the reason on which the employer actually relied.  *See Reeves*, 530 U.S. at 147 ("[I]t is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. . . .  In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.") (emphasis original); *id.* at 148 ("Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").  Thus, if the plaintiff can provide evidence of pretext, there is a genuine issue of material fact regarding discrimination,

34

and the case must be submitted to a jury.

### 1.   Evidence Supporting an Inference of Discrimination

Plaintiff offers several examples of evidence that he argues demonstrate that defendant's explanation is pretextual and thus support an inference of discrimination.[127]

### a.   Racism in the Maintenance department

First, plaintiff notes that at the time of the reduction-in-force, the Maintenance department was entirely white.[128]   Additionally, Louis Bethea, a black former Maintenance employee, testified that there was a racist culture in the department.[129] However, plaintiff has not offered any evidence that any member of the Maintenance department had any influence over Hunt's decision not to give Lucy a chance to bump into the Maintenance department.   The attitudes of the Maintenance employees are in no way material to the analysis of whether defendant's proffered reason is pretextual.

---

[127] As discussed *supra*, the pretext analysis is the proper stage for comparing the relative qualifications of the plaintiff and those in the positions he covets.   However, defendant's proffered reason is not that plaintiff is unqualified for the position, but rather that Hunt was unaware of any qualifications Lucy may have had.   Thus, the relative qualifications of Lucy, Protor, and Keller are actually not germane to the pretext analysis.

[128] Doc. no. 23, at 34.

[129] *See* Declaration of Louis Bethea ¶ 3.

### b.    Richie Haney's transition to Maintenance

Next, plaintiff points to the fact that "Hunt had allowed Haney, a white employee who had never worked in a maintenance department before and who had a similar maintenance background as Lucy, to move into maintenance."[130]   That statement misconstrues the evidence in the record regarding Haney's move into the Maintenance department.  It was Yates, not Hunt, who first suggested that Haney help with Maintenance.[131]   Initially, Haney assisted the Maintenance employees with their tasks, although still formally a member of a Production department.[132]   After eight months, a position in Maintenance became open.[133]   Haney interviewed — with Yates, not Hunt — for the job, and was selected over at least three outside candidates.[134]   The decision to hire Haney for an open position, following a formal interview, and after having interviewed outside candidates as well, is in no way akin to Hunt's decision (or non-decision) regarding Lucy during the reduction-in-force.  Although Lucy and Haney did have similar maintenance-related credentials upon beginning work at Georgia-Pacific, Haney's experience working closely with

---

[130] Doc. no. 23, at 34.

[131] Deposition of Richmond Haney, at 12-13; Declaration of Melvin Yates ¶ 11.

[132] Doc. no. 21-15 (Deposition of Richmond Haney), at 13, 29.

[133] *See* Deposition of Tami Anderson, at 85; Declaration of Tami Anderson ¶ 11; Deposition of Randy Hunt at 96-97.

[134] Deposition of Tami Anderson, at 86-89; Deposition of Richmond Haney, at 24, 36; Deposition of Randy Hunt, at 95-96.

Maintenance, and more importantly, the circumstances under which he formally moved into the department, greatly weaken plaintiff's assertion that Haney's move into Maintenance is evidence from which an inference of race discrimination can be drawn. Nothing about Haney's transition to Maintenance undermines the credibility of Georgia-Pacific's proffered reason: *i.e.*, Hunt's testimony that allowing Lucy to bump into Maintenance never crossed his mind because he assumed Lucy was not qualified.

### c.    Black employee not allowed to bump white employee

In offering evidence of pretext, plaintiff makes two assertions about Hunt's reaction to the prospect of a black employee bumping a white one. First, he states that, "when it came time for a black employee to bump a white one, Hunt disallowed bumping."[135] Next he states that "[t]he 'one hour' rule was not enforced by Hunt except when it involved the bumping of a white employee by a black employee."[136] Plaintiff argues that no black employee actually "bumped" any white employee during the reduction-in-force, while defendant argues that Donita Ratcliff's move into a Converting position previously held by a white employee who was laid off immediately is an example of such bumping.[137] Plaintiff asserts that those employees

---

[135] Doc. no. 23, at 34.

[136] *Id.* (bracketed alteration supplied).

[137] *Id.* at 12-13, 28, 29 n.17; doc. no. 24, at 7.

whose names were called in the initial layoff were not bumped by the employees who eventually filled their spots, because those jobs were open by the time they were chosen later that morning.[138]  However, such a distinction favors form over substance. The reason that the most junior employees were immediately laid off was that there was no chance that they would have survived the impending bumping process.

The fallacy of plaintiff's distinction between those bumped and those merely laid off is best illustrated by a counterfactual scenario.  Had there been no initial calling of names, the process of selecting new positions would have begun with all of the employees present, and eventually those at the bottom of the seniority list would have been bumped from their positions.  In plaintiff's view, the fact that their names were immediately called somehow negates the fact they were inevitably going to be bumped from their positions.  In other words, management's ability to predict which employees were certain to be bumped makes them "not bumped," and simply laid off.  In reality, however, any first or second shift employee who was laid off was bumped, as it was only the third shift that was shut down in the reduction-in-force.[139] The only explanation for any employee not working on the third shift to have been laid off is bumping.  The distinction plaintiff attempts to make between those laid off

---

[138] Doc. no. 23, at 12-13.

[139] Deposition of Tami Anderson, 12, 18-19.

"*en masse*"[140] and those "bumped" is purely semantic.

Moreover, to assert that "Hunt disallowed bumping" is to overstate the action Hunt actually took.  Rather than *disallowing* bumping, Hunt *assumed* that it was not possible under the circumstances, based on his lack of knowledge of Lucy's qualifications.  What the evidence arguably does support is better stated in plaintiff's second assertion regarding a black employee bumping a white one: *i.e.*, that the "one hour" rule was only enforced in Lucy's case.   Indeed, the record shows that employees who moved from other departments into Converting were not required to demonstrate their ability to do their new jobs within one hour.[141]   Hunt's statement that he assumed Lucy did not have the credentials to work in Maintenance is arguably a selective application of the "one hour" rule.   It is only *arguably* a selective application, though, because it may be better characterized as an inaccurate (or even lazy) application of the rule.  The three non-Converting employees who bumped into Converting had worked in Converting before.[142]   Thus, to the extent that Georgia-Pacific "applied" the "one hour" rule by assuming Lucy was not qualified to work in Maintenance, it also arguably "applied" the rule by assuming that the

---

[140] Doc. no. 23, at 29 n.17.

[141] Declaration of Cedric Readus ¶ 2; Deposition of Donita Ratcliff, at 38-39.

[142] Deposition of Derrick Lucy, at 210; Declaration of Tami Anderson ¶ 13; Deposition of Randy Hunt, at 34-35; Declaration of Tami Anderson ¶ 14; Deposition of Donita Ratcliff, at 8-9.

former Converting employees were qualified to work in Converting.  The fact that

these assumptions turned out to be false shows the danger inherent in making

decisions based on assumptions; it does *not* show that Hunt did not make an

assumption regarding Lucy's qualifications to work in Maintenance.  Finally, as

explained above, although he would have been the only black employee to bump a

white employee after the initial round of "*en masse*" layoffs, Lucy would *not* have

been the only black employee to bump a white employee as part of the reduction-in-

force as a whole.  Of perhaps greater significance, however, he would have been the

only Production employee to bump a Maintenance employee.

### d.    Hunt's testimony not credible based on information available to him

Finally, plaintiff suggests that Hunt's testimony that it never crossed his mind

to allow Lucy to show that he could work in Maintenance is "suspect" because (1)

Hunt knew that there were white Maintenance employees with less seniority than

Lucy; (2) he did not know the requirements to work in Maintenance; (3) he knew the

collective bargaining agreement treated Maintenance the same as Production; and yet

(4) he turned Lucy away from his opportunity to bid, "chos[ing] to remain ignorant

of Lucy's maintenance background."[143]  Missing from this list is the fact that Hunt

also would have been aware that not a single Production employee had bumped into

---

[143] Doc. no. 23, at 34-35 (bracketed alteration supplied).

Maintenance that day.[144]   There is no evidence before the court suggesting that any other Production employee had even expressed an interest in bumping into Maintenance.[145]   To the extent that the facts plaintiff highlights render Hunt's assumption that Lucy was unqualified "suspect," the suspicious nature of his testimony is mitigated by those facts that plaintiff does not list.  Hunt testified that the possibility that Lucy could bump into Maintenance never crossed his mind.  The totality of the facts available to Hunt does not suggest that it should have crossed his mind and, thus, his explanation is not is "suspect."

### 2.   Changing Articulation of Legitimate Reason

Plaintiff also argues that defendant has changed its articulation of a legitimate reason over the course of the litigation, which is suggestive of pretext.  *See Cleveland v. Home Shopping Network*, 369 F.3d 1189, 1194 (11th Cir. 2004).  Plaintiff points to Georgia-Pacific's position statement in response to his EEOC charge, in which the company stated that layoffs "were conducted on the basis of seniority *within each department*,"[146] contrasting it with defendant's current position that *plant* seniority was used in determining layoffs.[147]   However, plaintiff overlooks the preceding

---

[144] *See* Deposition of Tami Anderson, at 89-90.

[145] It is worth noting that if Keller and Proctor had less seniority than Lucy, they also had less seniority than every employee who met with Hunt before Lucy's turn arrived.

[146] Georgia-Pacific Position Statement, at 2.

[147] *See, e.g.*, doc. no. 21-1, at 5-6.

sentence in the position statement, in which Georgia-Pacific quotes the collective bargaining agreement provision that "employees with the greatest *plant* seniority *within each department or line of progression* shall be retained . . . ."[148]  Thus, the position statement *did* make reference to plant seniority.  Moreover, the deposition testimony in the record clearly establishes that Hunt called employees into his office by department, but based on plant seniority.[149]  Although the wording of the position statement is somewhat ambiguous, it is not so inconsistent with the evidence in the record or defendant's arguments on summary judgment as to demonstrate pretext.

Additionally, plaintiff argues that defendant has changed its articulation because in the position statement "there is obviously no assertion that Lucy was denied his bumping right because he was not qualified to work in maintenance."[150]  However, the silence of the position statement on this point is actually consistent with defendant's current articulation of a nondiscriminatory reason:  *i.e.*, that it never occurred to Hunt to allow Lucy to bump into Maintenance because he was unaware of Lucy's qualifications.  If Hunt never even considered the possibility that Lucy could bump into Maintenance, it would only be logical that qualifications would be

---

[148] Georgia-Pacific Position Statement, at 2 (first emphasis supplied, second emphasis in Position Statement).

[149] Deposition of Randy Hunt, at 17-20; Deposition of Leslie Ford, at 29-30.

[150] Doc. no. 23, at 36.

omitted from the position statement.

### 3.   Failure to Follow Company Policies

Finally, plaintiff argues that the court should find pretext based on the fact that Georgia-Pacific failed to follow its own policies and the collective bargaining agreement.  "[A]n employer's deviation from its own standard procedures may serve as evidence of pretext."  *Hulbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) (bracketed alteration supplied).  In *Hulbert*, the employer failed to follow its procedure in processing the plaintiff's termination.  *Id.*  Plaintiff argues that the selective application of the "one hour" rule is evidence of deviation from policy and, therefore, pretext.[151]  As discussed above, the record arguably suggests that the rule was uniformly (if ultimately incorrectly and with disparate results) "enforced" during the reduction-in-force.  However, even assuming that the rule was selectively enforced to the detriment of Lucy, the evidence still does not show pretext.   Although plaintiff argues that the distinction Defendant makes between Production and Maintenance is a "mirage,"[152] no employees moved from Production to Maintenance during the reduction-in-force.[153]  Moreover, the record

---

[151] The only policy that Georgia-Pacific arguably failed to follow is the "one hour" rule contained in the collective bargaining agreement, so the violation of the collective bargaining agreement need not be considered separately.

[152] Doc. no. 23, at 34 n.19.

[153] *See* Deposition of Tami Anderson, at 89-90.

indicates that those employees who moved into Converting from the other Production departments had prior experience in Converting.[154]   Those employees that plaintiff argues were exempted from the rule were moved into entry level positions in a department in which they had previously worked, while Lucy would have been making a unique transition into a department new to him.   Those facts undermine any suggestion of pretext that may arise from selective application.   Additionally, those employees whom plaintiff argues were exempted from the rule are black.[155]   Although deviation from policy can be *suggestive* of pretext, it does not automatically equate to pretext.   It is weak evidence of pretext here, where defendant *did* follow procedure with regard to plaintiff, and only deviated from it regarding other employees.   The evidence shows that the assumption that those employees' prior experience in the department qualified them to do their new jobs was proven to be incorrect.[156]   But plaintiff's argument that defendant's failure to follow the "one hour" rule (a deviation from procedure that actually benefitted some black employees) is evidence of pretext is unconvincing.

In sum, the evidence on which plaintiff relies does not show that defendant's

---

[154] Deposition of Derrick Lucy, at 210; Declaration of Tami Anderson ¶ 13; Deposition of Randy Hunt, at 34-35; Declaration of Tami Anderson ¶ 14; Deposition of Donita Ratcliff, at 8-9.

[155] Deposition of Derrick Lucy, at 202.

[156] *See* Deposition of Jimmie Burton, at 21-28, 36 (discussing Ratcliff's difficulty maintaining the pace of the "238").

articulated reason (that Hunt assumed Lucy was not qualified to work in Maintenance because he was unaware of Lucy's experience) is founded on such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that "a reasonable factfinder could find [it] unworthy of credence." *Silvera*, 244 F.3d at 1258 (bracketed alteration supplied).   The evidence plaintiff offers is either irrelevant or actually consistent with defendant's proffered legitimate reason.   Thus, the evidence is not sufficient to establish pretext and thereby create a genuine issue of material fact for a jury.

## D.      Other Evidence Sufficient to Create an Inference of Discrimination

The Eleventh Circuit has recently emphasized that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).   In *Smith*, the white plaintiff was unable to establish a *prima facie* case of race discrimination because he could not identify a similarly situated black "comparator" who was treated differently than he was. *Id.* at 1327-28.   However, the Eleventh Circuit held that the "convincing mosaic of circumstantial evidence" in the record allowed an inference of discrimination nonetheless.   *Id.* at 1328 (quoting *Silverman v. Board of Education of City of Chicago*, 637 F.3d 729, 734 (7th Cir.

2011).[157]  That "convincing mosaic of circumstantial evidence" included:  (1) a backdrop of racial tension in the company following a racially-motivated shooting less than two years earlier; (2) an upcoming television news special expected to portray the company's handling of racism at the workplace, both before and after the shooting, in an extremely unflattering light; and (3) the company's inclusion of race in a human resources spreadsheet used in determining the appropriate disciplinary action for each employee (including the plaintiff) implicated in the distribution of a racist email.  *Id.* at 1329-40.  Those factors demonstrated that the employer "had a substantial incentive to discipline white employees more harshly than black employees" and "consciously injected race considerations into its discipline decision making without an adequate explanation for doing so."  *Id.* at 1341.

Here, plaintiff has not assembled a "convincing mosaic of circumstantial evidence" sufficient to allow an inference of discrimination.  In his deposition, Lucy testified that he had not witnessed or been subjected to any racially insensitive comments or actions while employed by Georgia-Pacific.[158]  There is no evidence that race was included in the process of the reduction-in-force, which was carried out

---

[157] It seems that this alternate method of opposing summary judgment is intended to help a plaintiff who is unable to establish a *prima facie* case, rather than one whose case fails at the pretext stage, as the requirement of a "convincing mosaic of circumstantial evidence" of discrimination is higher than the standard at the pretext stage, *i.e.*, that the defendant's articulation is false.  However, the court will engage in the analysis despite the fact that plaintiff has established a *prima facie case*.

[158] Deposition of Derrick Lucy, at 65-66.

strictly by seniority.[159]  Nor is there any indication that race problems existed at the plant, other than among some Maintenance employees who were uninvolved in the decision-making process.[160]  That pales in comparison to the backdrop of racial tension at issue in *Smith*, in which the employer faced significant negative publicity stemming from earlier race-based violence.

## IV.  CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment is GRANTED on all claims.   Plaintiff's claims are DISMISSED with prejudice. Defendant's motion to strike is DENIED as moot.  Costs incurred herein are taxed to plaintiff.  The Clerk is directed to close this file.

DONE this 5th day of January, 2012.

_____
United States District Judge

---

[159] *See* Part II(C), *supra*.

[160] Declaration of Louis Bethea ¶ 3. *See also* Deposition of Derrick Lucy, at 66 (testifying that he has no knowledge of Hunt or Anderson discriminating against any other employee on the basis of race);